MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
BY:  SEETHA RAMACHANDRAN
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2546

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

            - v. -                :     VERIFIED COMPLAINT
                                        08 Civ.
$222,195.00 IN UNITED STATES      :
CURRENCY
                                  :
$50,000.00 IN UNITED STATES
CURRENCY, and                     :

$21,120.00 IN UNITED STATES       :
CURRENCY,
                                  :
            Defendants in rem.
                                  :
- - - - - - - - - - - - - - - - - - -x

       Plaintiff United States of America, by its attorney, MICHAEL J. GARCIA, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

### I. NATURE OF THE ACTION

       1.  This is an action by the United States of America seeking forfeiture of $222,195.00 in United States currency, $50,000.00 in United States currency, and $21,120.00 in United States currency (collectively, the "Defendant-in-rem Currency"). The Defendant-in-rem Currency is subject to forfeiture pursuant to Sections 981(a)(1)(A) and 984 of Title 18, United States Code,

as property involved in money laundering transactions or attempted money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957, and pursuant to 21 U.S.C. § 881(a)(6), as property used, and intended to be used, to facilitate the commission of a felony narcotics violation of Title 21, United States Code, Subchapter 1.  The Defendant-in-rem Currency is also subject to forfeiture pursuant to Section 5317 of Title 31, United States Code, as property involved in a transaction structured to evade reporting requirements, in violation of 31 U.S.C. §§ 5313 and 5324, or any conspiracy to commit any such violation, or any property traceable to any such violation or conspiracy.

## II. JURISDICTION AND VENUE

2.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355(a).

3.   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York, and pursuant to 28 U.S.C. § 1395(b) because the Defendant-in-rem Currency was found in the Southern District of New York.

4.   On or about March 20, 2008 the Defendant-in-rem Currency was seized pursuant to a warrant, authorized by the Honorable Bruce Allen, Justice of the New York State Supreme Court, Supreme Court of the State of New York, County and City of

New York. The Defendant-in-rem Currency is presently in the custody of the United States Marshals Service Seized Asset Deposit Fund Account held at the Federal Reserve Bank.

### III. PROBABLE CAUSE FOR FORFEITURE

5. An investigation regarding the laundering of narcotics proceeds conducted by agents of the United States Drug Enforcement Administration (the "DEA") and other law enforcement agencies has revealed the following:

#### Background

6. The need to launder narcotics dollars arises out of the massive amounts of cash generated by sales of South American drugs -- mostly cocaine and heroin -- in the United States. These narcotics are sold in the United States for U.S. dollars, almost always in cash, and often in small denominations. Reporting and record-keeping requirements mandated by statute and regulation prevent drug dealers from simply depositing those funds into accounts in the United States and transferring them to Colombia or other countries, so drug traffickers must disguise, or "launder," the funds in order to hide their true source.

7. The Black Market Peso Exchange ("BMPE") is one method used to launder drug money and evade the record-keeping and reporting requirements mandated by law, as well as Latin American foreign exchange and import laws and tariffs. The basic Colombian BMPE scheme operates as follows. In Colombia, the

owners of the narcotics proceeds generated in the United States contact a third party -- generally referred to as a "peso broker" -- who agrees to provide Colombian pesos he controls in Colombia for the cash narcotics proceeds that the trafficker controls in the United States. A two-stage exchange is then arranged: in the United States, the broker's representatives pick up the cash narcotics proceeds -- often hundreds of thousands of U.S. dollars or more at a time -- from the traffickers' representatives; in Colombia, the broker pays the traffickers the corresponding amount (less the broker's commission) in Colombian pesos. Once this exchange occurs, the traffickers have effectively laundered their money and are out of the BMPE process. The peso broker, on the other hand, must now do something with the U.S. dollars that he has obtained in the United States so that he can obtain more pesos to begin the process again. In other words, the peso broker, who now has a pool of narcotics-derived funds in the United States, must find persons or businesses willing to buy U.S. dollars for pesos.

   8. Colombians who want to buy dollars and who have pesos to sell then make arrangements with the peso broker. A Colombian businessman who needs dollars to fund an offshore investment account, or to pay a U.S. company for goods or services imported into Colombia, for example, might go to a broker to buy dollars instead of the overt Colombian banking system. By doing

so, the businessman can get better exchange rates than from the banks and can avoid Colombian currency transaction reporting requirements and paying certain Colombian import and exchange tariffs. Once the businessman pays the broker in pesos, the peso broker will direct that the dollars he has accumulated from the traffickers and put into the banking system be sent, usually by wire transfer, to wherever the sellers want them transferred.

9. All three parties involved in the BMPE process thus benefit: the traffickers receive laundered pesos; the Colombians wishing to buy dollars convert their pesos without reporting or paying taxes and tariffs; and the peso broker makes his profits on the "spread" between the price that the broker buys and sells the dollars.

10. The BMPE process may also involve more than one peso broker. One broker, for example, might have the direct relationship with the cartels in Colombia; another might have the contacts in the United States who can accumulate the narcotics proceeds; and yet a third might have the contacts with businesspeople or other wealthy Colombians who want dollars and have pesos to sell. Irrespective of how many intermediaries there are, the result is the same: pesos in Colombia are used to buy narcotics proceeds in U.S. dollars.

11. The fact that the Black Market Peso Exchange almost invariably utilizes narcotics proceeds has been widely publicized

-5-

in Colombia. Any party using BMPE brokers in Colombia thus knows or reasonably should know that there is a substantial likelihood that the dollars they receive as the result of their transactions with peso brokers are the proceeds of narcotics transactions.

    12. The peso broker who accumulates the narcotics dollars in the United States must find a way to introduce those dollars into the banking system while avoiding detection by the authorities. One of the well-known methods of achieving this goal is through the practice of making multiple deposits of low-value monetary instruments purchased from banks or other money services businesses to multiple consumer checking and/or savings accounts. This common money laundering scheme, known as "smurfing," takes many forms. Smurfing can be conducted by one or more couriers making deposits to one or more accounts at a bank during several visits. A number of these "smurfs" may arrive at an institution together and go to different tellers, or to different branches, to make deposits to one or more related accounts. These accounts may be used for a brief period of time before they become dormant.

    13. Typically these and other similar kinds of smurfing transactions are below some limit, a limit above which financial institutions must file a report. For example, the Bank Secrecy Act, codified at Title 31, United States Code, Sections 5300 et seq., and the regulations promulgated thereunder, require banking facilities and certain other financial institutions to report any

cash transaction over $10,000 by filing a Currency Transaction Report ("CTR"). Banks are also required to file Suspicious Activity Reports ("SARS") to report transactions over a certain amount that they suspect involve money laundering or otherwise violate the Bank Secrecy Act. To avoid these and other reporting requirements, depositors will break up or "structure" larger deposits.

<u>The Defendant-in-rem Currency</u>

14. On information and belief, Top and Top Enterprises, LTD, located at 1239 Broadway, Suite 700, New York, NY 10001, has participated in the laundering of narcotics proceeds through the BMPE scheme.

15. On information and belief, federal law enforcement agents observed the exchange of drug proceeds while performing surveillance on Top and Top Enterprise, LTD.

16. On or about March 20, 2008 the Defendant-in-rem Currency was seized during the execution of a search a warrant of Top and Top Enterprises, LTD 1239 Broadway, Suite 700, New York, NY 10001 (the "Top & Top Premises"), authorized by the Honorable Bruce Allen, Justice of the New York State Supreme Court, Supreme Court of the State of New York, County and City of New York. The currency was discovered as follows:

    a. After arriving at the Top & Top Premises, law enforcement agents questioned employees of Top &

        Top about whether there was money on the Top & Top Premises. The employees responded, in sum and substance, that there was no cash kept on the premises.

b. Law enforcement agents attempted to obtain access to the office area of the Top & Top Premises, which was locked, through an employee who they observed with keys. The employee claimed that his keys did not open the office. The agents secured the keys from the employee and successfully opened the office area using one of the keys that the employee stated did not open the office.

c. The agents discovered $222,195.00 in United States currency in a UPS envelope underneath a sofa cushion, bundled in a manner that is consistent with how narcotics proceeds are typically bundled.

d. The agents discovered $50,000.00 in United States currency in a box on the floor underneath a desk office, bundled in a manner that is consistent with how narcotics proceeds are typically bundled; and

e. The agents discovered $21,120.00 in United States currency inside an office desk drawer, bundled in a manner that is consistent with how narcotics proceeds are typically bundled.

## IV. CLAIM FOR FORFEITURE

17. Incorporated herein are the allegations contained in paragraphs one fifteen of the Verified Complaint.

### Sections 981(a)(1)(A) and 1956

18. Title 18, United States Code, § 981(a)(1)(A) subjects to forfeiture "[a]ny property real or personal involved in a transaction or attempted transaction in violation of . . . section 1956 . . . of this title, or any property traceable to such property."

19. Title 18, United States Code, § 1956(a) provides:

> (a)(1) [w]hoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of Section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under State or Federal law.

20. A "financial transaction," as defined by 18 U.S.C. § 1956(c)(4), includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement

of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

21. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1). Section 1961(1) lists as an offense "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States." Section 1961(1) also lists as an offense violations of 18 U.S.C. § 1956, relating to the laundering of monetary instruments.

22. Because the Defendant-in-rem Currency relates to the concealment and laundering of narcotics proceeds, such funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as they represent property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 1956(a)(1)(B)(ii), and property traceable to such property.

### Sections 981(a)(1)(A) and 1957

23. Title 18, United States Code, § 981(a)(1)(A) subjects to forfeiture to the United States "[a]ny property real or personal involved in a transaction or attempted transaction in violation of . . . section 1957 . . . of this title, or any property traceable to such property."

24. Title 18, United States Code, § 1957 provides, in pertinent part:

> (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).
>
> * * *
>
> (d) The circumstances referred to in subsection (a) are --
>
> (1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States . . . .

25. "Monetary transactions" is defined in 18 U.S.C. § 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

26. "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

27. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense under 18 U.S.C. § 1961(1). Section 1961(1) lists as an offense "the felonious manufacture, importation, receiving, concealment, buying,

selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States." Section 1961(1) also lists as an offense violations of 18 U.S.C. § 1956, relating to the laundering of monetary instruments.

28. Because the Defendant-in-rem Currency constitutes criminally derived property derived from narcotics trafficking and the laundering of monetary instruments, exceed $10,000, and were involved in a monetary transaction, such funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as they represent property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, and property traceable to such property.

### Section 984 of Title 18 of the United States Code

29. Section 984 of Title 18 of the United States Code provides, in pertinent part:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals--
>
> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
>
> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.
>
> (b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.
>
> (c)(1) Subsection (a) does not apply to an action against funds held by a financial institution in an interbank account unless the account holder knowingly engaged in the offense that is the basis for the forfeiture.
>
>     \*  \*  \*
>
> (d) Nothing in this section may be construed to limit the ability of the Government to forfeit property under any provision of law if the property involved in the offense giving rise to the forfeiture or property traceable thereto is available for forfeiture.

30. In substance, among other things, this provision permits the Government to seize and forfeit funds in a bank account into which forfeitable assets have been transferred within one year, without the necessity of showing that the specific funds now in the account themselves constitute the forfeitable funds. In other words, "tracing" of the funds in the account now to the forfeitable funds that were transferred into the account is not required for transfers within one year of the seizure.

<u>Section 5317(c) of Title 31</u>

31. Section 5317(c) of Title 31, United States Code,

subjects to seizure and forfeiture "[a]ny property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy[.]"

32. Section 5313 of Title 31, United States Code, mandates reports by financial institutions on domestic coins and currency transactions.

33. Under 31 U.S.C. § 5324(a):

No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508--

***
(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

34. Because the Defendant-in-rem Currency is involved in transactions structured to evade reporting requirements, such funds are subject to forfeiture pursuant to 31 U.S.C. § 5317(a), as property involved in a violation of section 5313, 5316, or 5324 of Title 31, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy.

35. By reason of the above, the Defendant-in-rem Currency is subject to forfeiture to the United States of America,

pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984; and 31 U.S.C. § 5317(c).

### Section 881(a)(6) of Title 21

36. Incorporated herein are the allegations contained in paragraphs one through thirty-five of the Verified Complaint.

37. Pursuant to 21 U.S.C. § 881(a)(6), all moneys furnished or intended to be furnished in exchange for a controlled substance, all proceeds traceable to such exchanges, and all moneys used or intended to be used to facilitate such exchanges, in violation of Subchapter I of Title 21 of the United States Code, are subject to seizure and forfeiture to the United States, and no property right exists in such proceeds.

38. The Defendant-in-rem Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because there is probable cause to believe that it constitutes moneys intended to be furnished in exchange for a controlled substance, and/or proceeds traceable to such exchanges, and/or moneys used or intended to be used to facilitate such exchanges, in violation of Subchapter I of Title 21 of the United States Code.

39. By reason of the above, the Defendant-in-rem Currency is subject to forfeiture to the United States of America, pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-in-rem Currency and that all persons having an interest in the Defendant-in-rem Currency be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-in-rem Currency to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       August 11, 2008

        MICHAEL J. GARCIA
        United States Attorney for the
        Southern District of New York
        Attorney for the Plaintiff
        United States of America

By: _____
    SEETHA RAMACHANDRAN
    Assistant United States Attorney
    One St. Andrew's Plaza
    New York, New York 10007
    Telephone: (212)637-2546

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK)

STEVEN YAGODA, being duly sworn, deposes and says that he is a Litigation Financial Analyst, Forfeiture Support Associates, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the grounds of his belief are from official records and files of the United States Government, and information obtained directly by deponent during an investigation of alleged violations of Titles 18 and 21, United States Code.

STEVEN YAGODA
Litigation Financial Analyst
Forfeiture Support Associates

Sworn to before me this
11-day of August, 2008

NOTARY PUBLIC

LESLEY B. GLENN
Notary Public, State of New York
No. GL-4554637
Qualified in New York County
Commission Expires 6/30/11

-17-